John D. MARKS, Plaintiff,

v.

CDW COMPUTER CENTERS, INC., f/k/a MPK Computing, Inc. and Michael P. Krasny, Defendants.

No. 93 cv 3487.

United States District Court, N.D. Illinois, Eastern Division.

Sept. 22, 1995.

Damon E. Dunn, Vance L. Liebman, James Frederick Groth, Levin & Funkhouser, Ltd., Chicago, IL, for plaintiff John D. Marks.

Scott J. Szala, Dan K. Webb, Christopher M. Nolan, Winston & Strawn, Chicago, IL, Allan Tracy Slagel, James Donehoo Wilson, Shefsky, Froelich & Devine, Ltd., Chicago, IL, Dean A. Dickie, D'Ancona & Pflaum, Chicago, IL, David T. Rallo, Rallo & Tepper, Chicago, IL, Phillip Shawn Wood, D'Ancona & Pflaum, Chicago, IL, for defendants CDW Computer Centers Inc., Michael P. Krasny.

Lynda T. Roundtree, Hefter & Radke, Chicago, IL, for objector First National Bank of Chicago.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This case comes before this court on defendant's Motion to Dismiss for failure to state a claim and failure to plead fraud pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b), respectively. For the reasons stated below, this court grants the motion without prejudice. We grant plaintiff leave to file an amended complaint if he can plead facts that enable him to surmount the obstacles this opinion discusses in detail.

## BACKGROUND

For the purposes of this Motion to Dismiss, we take the facts that the plaintiff alleges in the complaint as true. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984). The plaintiff, John Marks, began working for defendant, CDW Computer Centers, Inc. ("CDW"), f/k/a MPK Computing, Inc., in September 1985. CDW and its predecessor, MPK Computing, Inc., are collectively referred to hereinafter in this opinion as CDW. CDW sells microcomputers. CDW was incorporated under the laws of the State of Illinois in 1984 and reincorporated in 1993 under the laws of Delaware. Marks began his tenure at CDW as a commission-paid salesperson. Defendant Michael Krasny was at all relevant times the Chairman of the Board of Directors, Chief Executive Officer, and majority shareholder of CDW.

Approximately three months after Marks began working for CDW, Krasny discussed with Marks the possibility of expanding Marks' duties. Krasny suggested that Marks accept a promotion to sales manager and head of purchasing and assume substantial managerial responsibilities for CDW. In return, Krasny discussed giving Marks an equity position in CDW at some point in the future. Marks agreed to the proposal. Marks subsequently undertook his new responsibilities.

In early 1988, Krasny and Marks consummated Krasny's promise to give Marks equity in CDW. On January 15, 1988, Marks and Krasny signed a Stock Purchase Agreement ("Purchase Agreement") according to which Marks purchased 250 shares of voting common stock of CDW. Marks' equity position represented 20 percent of CDW's shares. In return, Marks paid to CDW $124,980 in cash and issued a promissory note for $42,100 plus interest. Marks also agreed to lend CDW $112,100.

Also on January 15, 1988, Marks, Krasny and CDW entered into another agreement— a Stockholder Agreement. This agreement granted to CDW and Krasny successive options to buy Marks' shares upon his termination of employment, either voluntarily or for cause, with CDW. Under the Stockholder Agreement, Krasny and CDW had 60 days from Marks' termination of employment from CDW in which to exercise these options.

Starting in 1989, Krasny began relieving Marks of his responsibilities at CDW. In November 1989, Krasny approached Marks about the possibility of Marks transferring from CDW headquarters in Northbrook, Illinois to the company's showroom in Chicago. Part of the deal was for Marks to assume a new position as sales manager in Chicago. Marks agreed to the transfer.

Marks attended a meeting with Krasny and CDW's accountant in March 1990. To Marks' surprise, Krasny indicated that he wanted to terminate Marks' association with CDW. At that time, Krasny allegedly told Marks that Marks would see no benefit from his shares in CDW unless he sold them on terms that Krasny dictated. Krasny mailed a letter to Marks on May 14, 1990, notifying Marks of his immediate termination of employment.

Sometime on or about March 1990, Krasny proposed paying himself an enormous bonus. This bonus, Marks believed, would increase Krasny's compensation six-fold to a total of $1.55 million for the year ending March 31, 1990. Krasny introduced a resolution to ratify the $1.55 million compensation package at a special meeting of the board of directors on June 12, 1990. Marks, as a director of CDW, voted against the resolution.

On occasion, Krasny mentioned to Marks that he had met with some investment bankers who had approached Krasny about the

possibility of outside investment. Krasny did not disclose to Marks any material information the investment bankers may have given Krasny about the value of CDW and the prospects for the sale of CDW's stock.

Starting in March 1990, Marks, Krasny and CDW conducted negotiations for the redemption of CDW shares. Marks attempted to investigate the value of his shares in CDW. Marks asked Krasny for information regarding the value of CDW and Northbrook Ad Agency, Inc. ("NAA") that Krasny owned. CDW placed a major portion of its advertising business with NAA. Marks alleges that Krasny informed him in a telephone conversation in June 1990 that NAA made almost no profit; any such profits had been reinvested in CDW or spent by NAA for CDW's benefit. Marks maintains that he received no other information regarding the financial performance of NAA or the substance or structure of transactions between CDW and NAA except gross amounts paid by CDW to NAA.

Marks alleges that Krasny placed conditions on the buy-back of CDW's shares from Marks. As a condition to the stock redemption, Krasny required Marks to approve the June 12, 1990 resolution to increase Krasny's compensation to $1.55 million for the year ending March 31, 1990. On July 27, 1990, Marks signed a document approving the June 12, 1990 resolution. On or about July 27, 1990, Marks and CDW executed a Stock Purchase Agreement ("Buyout Agreement"), involving the sale of Marks' shares for $470,-028. This sale left Krasny as the sole shareholder of CDW.

In 1993, CDW prepared for an initial public offering. On March 19, 1993, CDW filed with the Securities and Exchange Commission a registration statement on Form S–1. CDW proposed to offer approximately 16 percent of its outstanding common stock to the public in an initial public offering. The registration statement indicates that subsequent to the execution of the Buyout Agreement, Krasny was paid large amounts of cash from CDW, including a cash bonus of over $7 million in 1992.

After reading the registration statement, Marks learned more information about NAA and CDW. Marks learned that during the years ending March 31, 1991 through March 31, 1993, CDW made payments to NAA in amounts exceeding the amounts that NAA paid to magazines and other media by between $300,000 and $700,000 per year. Marks also discovered that between April 1, 1987 and March 31, 1990, NAA accumulated net profits of approximately $380,000, which Krasny subsequently withdrew.

Marks filed a complaint before this court in June 1993. The complaint contains two counts. Count I alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 against Krasny and CDW. Count II alleges state law claims of fraud and deceit against CDW and Krasny. The defendants filed the instant motion to dismiss.

### DISCUSSION

■■■ The standard governing this court's decision on a Rule 12(b)(6) motion is well settled. Only if the allegations of the complaint, and all reasonable inferences drawn therefrom, could not support any cause of action may this court grant the motion. *See generally* 5A Charles Wright & Arthur Miller, *Federal Practice and Procedure:* Civil 2d § 1357 (2d ed., 1990). The court must interpret ambiguities in the complaint in favor of the plaintiff, and the plaintiff is free, in defending against the motion, "to allege without evidentiary support any facts [it] pleases that are consistent with the complaint, in order to show that there is a state of facts within the scope of the complaint that if proved (a matter for trial) would entitle [it] to judgment." *Early v. Bankers Life and Casualty Co.*, 959 F.2d 75, 79 (7th Cir.1992). In reviewing the claims here, we keep in mind that the plaintiff is not required to prove that he can win on the pleadings, but only that his allegations are sufficient to state a cause of action. *Rankow, et al., v. First Chicago Corp.*, 870 F.2d 356, 366 (7th Cir.1989).

### I. RELIANCE ON MATERIALS NOT ATTACHED TO THE COMPLAINT

■■ Rule 12(b)(6) motions address the face of the complaint. *See Goldman v. Bel-*

*den,* 754 F.2d 1059, 1065 (2nd Cir.1985). The complaint is deemed to include documents attached to it as an exhibit or documents incorporated in it by reference. *Id.,* Fed. R.Civ.P. 10(c) and 5A Charles Wright & Arthur Miller, Federal Practice and Procedure: Civil 2d § 1327. Rule 12(b)(6) provides that when a court decides to consider matters outside of the complaint, the "motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." The United States Supreme Court has long held that this conversion provision of Rule 12(b)(6) from a motion to dismiss to a summary judgment motion is mandatory when a federal court considers matters outside of the complaint. *Carter v. Stanton,* 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972) (per curiam).

The Seventh Circuit has established a narrow exception to the "four corners of the complaint" doctrine regarding Rule 12(b)(6) motions. In *Venture Associates v. Zenith Data Systems,* 987 F.2d 429 (7th Cir.1993), the Seventh Circuit determined that district courts may in limited circumstances examine documents that the plaintiff failed to attach to the complaint and the defendant attached to its motion to dismiss. The Court of Appeals explained that a "plaintiff is under no obligation to attach to her complaint documents upon which her action is based, but a defendant may introduce certain documents if the plaintiff failed to do so." *Id.* at 431. The Court of Appeals held that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Id.* In *Venture Associates,* the Court of Appeals concluded that the district court properly refused to exclude documents neither attached to nor incorporated by the complaint as the district court considered the pending motion as a motion to dismiss for failure to state a claim rather than as a motion for summary judgment. *Id.* at 432. The Seventh Circuit reaffirmed this narrow exception more recently in *Wright v. Associated Insurance Companies, Inc.,* 29 F.3d 1244 (7th Cir.1994) (Court of Appeals affirmed the con-

sideration by the district court of an agreement, which the complaint did not contain nor incorporate, because the document was central to the plaintiff's claims and the plaintiff referred to the document in the complaint.)

■ In the instant motion to dismiss, the defendants refer to documents not attached to the complaint. In the defendants' Memorandum of Law In Support of their Motion to Dismiss, they filed multiple exhibits: (a) the original Stock Purchase Agreement; (b) the Stock Purchase Agreement of 1990 ("Buyout Agreement"); (c) MPK Computing Inc., Report on Audit of Financial Statements for the years ended March 31, 1990 and 1989; (d) *Tregenza v. Great American Communications Company,* 823 F.Supp. 1409 (N.D.Ill. 1993), *aff'd.,* 12 F.3d 717 (7th Cir.1993), *cert. denied,* ―― U.S. ――, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994); and (e) *Vassilatos v. Ceram Tech International Ltd.,* 1993 WL 177780 (S.D.N.Y. May 19, 1993). In their motion to dismiss and supporting briefs, the defendants frequently refer to several of these exhibits. The plaintiff did not attach any of the exhibits to the complaint nor did he incorporate these documents into the complaint. This court will not convert the motion to dismiss into summary judgment motion at the present because we have not given the parties adequate notice. As far as exhibits are concerned, in analyzing the instant motion to dismiss this court will consider those exhibits, which the defendants supplied along with their motion, that meet the standard of *Venture Associates.*

■ Exhibit A contains the January 15, 1988 Stock Purchase Agreement as well as exhibits to that agreement. The attachments to the Stock Purchase Agreement include a non-negotiable promissory note obligating Marks to pay CDW $42,100 as consideration for the stock sale, a pledge agreement for the sum of $42,100, a January 1988 Stockholder Agreement establishing the successive buyback options by CDW and Krasny for Marks' shares of stock, and non-negotiable promissory and subordinated notes. The Complaint mentions the January 15, 1988 Stock Purchase Agreement and the obligations arising

under the attachments to Exhibit A. *See* Complaint at ¶¶ 14–15. The Stock Purchase Agreement and the Stockholder Agreement of January 1988 are the basis for Marks' claim to ownership interest in the stock that is subject to the dispute here. We find the documents contained in Exhibit A to be mentioned in the Complaint and central to Marks' claim. Consequently, we will examine Exhibit A in deciding this motion to dismiss.

■ Exhibit B contains the July 27, 1990 Stock Purchase Agreement and various attachments. The Stock Purchase Agreement of 1990 obligates Marks to sell his shares to CDW's predecessor. The Complaint refers to this Stock Purchase Agreement as a "Buyout Agreement." *See* Complaint at ¶¶ 25, 35–37, 39, 42. The Stock Purchase Agreement of 1990 memorializes Marks' sale of his minority shares to CDW's predecessor. Marks' claims of securities and common law fraud arise out of that transaction. Since the 1990 Stock Purchase Agreement is central to Marks' claims and is referred to in the Complaint, we will consider this document as we decide the instant motion to dismiss.

■ Exhibit C contains a Report on audit of Financial Statements for the defendant corporation for the years 1989–90. Since the Complaint does not refer to this report, Exhibit C fails to meet the *Venture Associates* standard. Consequently, we will disregard this exhibit.

■ Exhibits D and E contain judicial opinions in other cases. This court will take judicial notice of these two cases contained in Exhibits D and E. *See, Retired Chicago Police Association, et al. v. City of Chicago, et al.,* 7 F.3d 584, nt. 30 (7th Cir.1993) (Courts can take judicial notice of the decisions of federal and state courts.)

## II. FEDERAL SECURITIES ACTS—Section 10(b) and Rule 10b–5

In the 1930s Congress enacted two landmark pieces of legislation to regulate securities markets. The Securities Act of 1933 ("1933 Act") was designed to "provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails, and to prevent frauds in the sale thereof, and for other purposes." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 728, 95 S.Ct. 1917, 1921, 44 L.Ed.2d 539 (1975), *reh'g. denied,* 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975). The 1933 Act establishes federal requirements for registration statements and prospectuses and also creates private civil causes of action. *Id.* at 728, 95 S.Ct. at 1922. The Securities and Exchange Act of 1934 ("1934 Act") "provide[s] for the regulation of securities exchanges and of over-the-counter markets operating in interstate and foreign commerce and through the mails, … prevent[s] inequitable and unfair practices on such exchanges and markets, and for other purposes." *Id.* The 1934 Act is divided into two sections: Title I concerns regulations of securities exchanges and Title II amends the 1933 Act. *Id.*

The Securities Acts proscribe fraud in connection with securities transactions. In particular, Section 10(b) of the 1934 Act provides that it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance" in contravention of SEC rules that were promulgated in the interest of the investing public. 15 U.S.C. § 78j(b). The Securities and Exchange Commission's Rule 10b–5, which was promulgated pursuant to § 10(b), states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, … in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5.

■ To state a viable claim under § 10(b) and Rule 10b–5, a complaint must allege that while buying or selling securities the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on the defendant's actions caused plaintiff's injury. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), *reh'g. denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976). *See also Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989).

## A. SUBJECT MATTER JURISDICTION

As an initial matter, this court must ensure that it has subject matter jurisdiction over this case. Diversity jurisdiction is not available here since the plaintiff and defendants are Illinois residents. The plaintiff alleges federal question jurisdiction pursuant to 28 U.S.C. § 1331. The plaintiff premises federal question jurisdiction upon alleged violations of federal securities laws, including Section 27 of the 1934 Act, 15 U.S.C. § 78aa. Initially, this court must consider whether transactions that may be exempt from registration requirements under the federal securities laws raise a federal question for jurisdictional purposes.

■ Federal securities laws require issuers to register their stock with a national securities exchange unless the security or transaction is covered by an exemption. Section 5 of the 1933 Act, 15 U.S.C. § 77e. The 1933 Act's registration requirements are to ensure that investors have adequate information upon which to base their investment decisions. Thomas Lee Hazen, *Treatise on The Law of Securities Regulation ("Treatise")*, § 2.2 at 61 (2nd ed. 1990). Federal securities laws exempt from registration requirements certain private placements by the issuer and other "downstream investors." Section 4(2) of the 1933 Act, 15 U.S.C. § 77d(2); Section "4(1.5)" exemption, *See Treatise*, § 4.26.1; Securities Exchange Rule 144, 17 C.F.R. § 230.144. Even transactions that are exempt from registration requirements under the federal securities laws are still subject to the anti-fraud provisions of

the 1933 and 1934 Acts and Rule 10b–5. 15 U.S.C. § 77q(c). *See, also Gould v. Ruefenacht, et al.*, 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985) (the sale of 50% interest in a close corporation constituted a securities transaction subject to anti-fraud provisions of federal securities laws); *see, also, Treatise*, § 4.3, n. 19, § 13.2 at 25, § 4.1 at 34.

In the case at bar, defendant CDW sold some of its stock to the plaintiff in January 1988 pursuant to a Stock Purchase Agreement. (Complaint, ¶ 14). Contemporaneously, the plaintiff and defendants Krasny and CDW entered into a Stockholder Agreement which gave the defendants options to purchase the plaintiff's shares upon his termination of employment with CDW. *Id.* ¶ 15. In July 1990, CDW executed the Stock Purchase Agreement, which made Krasny the only CDW shareholder. *Id.* at ¶¶ 25, 26. Three years later, CDW filed a registration statement with the Securities and Exchange Commission for an initial public offering of CDW stock. *Id.* ¶ 27.

■ Even assuming *arguendo* that the plaintiff's sale of CDW stock back to the defendant constitutes a private placement covered by one of the exemptions under the 1933 Act, this case arises under the anti-fraud provisions of the federal securities laws. Since the plaintiff raises a federal question, we have federal question jurisdiction pursuant to 28 U.S.C. § 1331.

■ To establish federal jurisdiction for a Rule 10b–5 claim, some aspect of the securities transaction must have been executed through the use of an instrumentality of interstate commerce. *Treatise*, § 13.2, at 64. Intrastate telephone calls have supported federal jurisdiction. *See, e.g., Loveridge v. Dreagoux*, 678 F.2d 870, 874 (10th Cir.1982); *Myzel v. Fields*, 386 F.2d 718 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968); *Hidell, et al. v. International Diversified Investments*, 520 F.2d 529, 537 (7th Cir.1975) (The Seventh Circuit did not decide this issue). *See, also, Treatise, supra*, § 14.1.1 at 228 n. 6. The plaintiff alleges that defendant Krasny misrepresented the value of CDW during a telephone conversation they had in June 1990. (Com-

plaint, ¶ 23.) The plaintiff does not allege whether this call was local or interstate. Even if the call was intrastate, it makes no difference here because the plaintiff still meets the jurisdictional requirement of Section 10(b) based on the facts pleaded so far. We must consider not only the phone call between Krasny and Marks but also the letter Krasny mailed to Marks formally notifying Marks of his termination from CDW. The letter set in action the defendants' right to exercise their option to repurchase CDW shares; from that event the facts of this suit arose. Consequently, this court has jurisdiction over the cause of action despite the absence of diversity of citizenship. Supplemental jurisdiction pursuant to 28 U.S.C. § 1367 grants this court jurisdiction over the state-law claims as well.

## B. STANDING TO SUE UNDER RULE 10b–5

This court must determine whether in the pending action the plaintiff has standing to sue pursuant to Rule 10b–5. The United States Supreme Court held that a plaintiff in a Rule 10b–5 action has standing to sue if the plaintiff is a "purchaser" or "seller" of "securities" as defined by the 1934 Securities Exchange Act. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 754–55, 95 S.Ct. 1917, 1934, 44 L.Ed.2d 539 (1975). The 1934 Act defines "purchase" and "sale" to include any contract to buy, sell, or otherwise dispose of securities. 15 U.S.C. § 78c(a)(13),(14). The 1934 Act defines "security" to include shares of stock. *Id.* at § 78c(a)(10).

After reviewing the facts alleged in the complaint in the pending action, we find that the plaintiff has standing to sue pursuant to Rule 10b–5. In July 1990, the plaintiff executed a Stock Purchase Agreement between him and CDW's predecessor whereby the plaintiff sold to the company all of his shares. Complaint, ¶ 25. The plaintiff is a "seller" of securities for the purposes of the 1934 Act.

## III. TIME TO SUE

Both parties in the case at bar agree that federal law supplies the relevant statute of limitations here. They disagree as to whether the statute of limitations bars this suit. The defendants urge this court to dismiss the complaint because they believe that the statute of limitations on the pending case ran out long before the plaintiff filed the current action. The plaintiff counters by arguing that the one-year statute of limitations began running three months before plaintiff filed the suit.

The statute of limitations is an affirmative defense. *Tregenza v. Great American Communications Co.,* 12 F.3d 717, 718 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994). Plaintiffs need not anticipate and negate affirmative defenses in the complaint. *Id. See also, Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1924, 64 L.Ed.2d 572 (1980). Plaintiffs may plead themselves out of court if their complaint indicates that their claim is barred by a statute of limitations or a statute of repose.

This Circuit has not imposed an affirmative duty upon plaintiffs to plead sufficient facts in the complaint to counter a subsequent challenge raised in a motion to dismiss based on the statute of limitations or statute of repose. 12 F.3d at 718. If the complaint fails to state the date at which the statutory period began to run, the defendant may file an affidavit containing that fact along with a motion to dismiss. *Id.* at 719. In that case, the court must treat the motion to dismiss as a motion for summary judgment pursuant to Fed.R.Civ.P. 56; the court must grant the motion if there are no contested material issues of fact. *Id.* In the case at bar, the defendants filed no such affidavit to accompany their motion to dismiss. Absent notice to the parties for a conversion from a Rule 12(b) to a Rule 56 motion, we will treat the instant motion as a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). With this in mind, we will discuss in turn whether the complaint was timely filed pursuant either to the applicable statute of repose or to the statute of limitations.

Count I of the complaint is premised on alleged violations of Section 10(b) of the 1934 Act and Rule 10b–5. Since courts, rather

than Congress, created an implied remedy for violations of Section 10(b) of the 1934 Act and Rule 10b–5, courts have had to look outside of Section 10(b) and Rule 10b–5 for the applicable statute of limitations. Prior to 1990, this Circuit relied upon state blue sky laws to supply the relevant statute of limitations for federal securities cases. *See Short v. Belleville Shoe Manufacturing Co.,* 908 F.2d 1385, 1387–88 (7th Cir.1990) (discussing the history of this Circuit's adoption of state and federal statutes of limitation), *cert. denied,* 501 U.S. 1250, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). In *Short,* the Seventh Circuit overruled the precedent and held that federal rather than state law supplies the statute of limitations in suits under § 10(b) and Rule 10b–5. 908 F.2d at 1389.

One year after the Seventh Circuit's ruling in *Short,* the United States Supreme Court affirmed that federal law establishes the applicable statute of limitations period for Section 10(b) and Rule 10b–5 claims. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), *reh'g. denied,* 501 U.S. 1277, 112 S.Ct. 27, 115 L.Ed.2d 1109 (1991). The *Lampf* Court determined that a Section 10(b) and Rule 10b–5 actions are barred unless brought within one year of the discovery of the untrue statement or omission but in no event shall any action be brought more than three years after the sale of the security. *Id.* at 364, 111 S.Ct. at 2782; *see also* 15 U.S.C. § 77m.

On the same day that the Supreme Court announced its ruling in *Lampf,* a divided Court also decided *James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), a case about retroactivity. In *Beam,* the Court held that if a new rule has been applied to the parties before a federal court, that rule must apply to all cases then pending on direct review. *Id.* 501 U.S. at 543, 111 S.Ct. at 2448. Since at that time the Court applied its new rule on statute of limitations in *Lampf* to the parties before the court, *Beam* made *Lampf* applicable to all then ongoing securities fraud cases.

*McCool v. Strata Oil Co.,* 972 F.2d 1452 (7th Cir.1992).

■■■ In 1991, Congress partially overruled *Lampf* and *Beam* by adding § 27A to the 1934 Act.[1] Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, Title IV, § 476, 105 Stat. 2236, 2387 (1991), codified at 15 U.S.C. § 78aa–1. This new section amends the 1934 Act by mitigating the combined effect of *Lampf* and *Beam* on cases commenced before the Court decided *Lampf* and *Beam.* The amendment, § 27A, provides:

(a) Effect on pending causes of action

The limitation period for any private civil action implied under section 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

(b) Effect on dismissed causes of action

Any private civil action implied under section 78j(b) of this title that was commenced on or before June 19, 1991—

(1) which was dismissed as time barred subsequent to June 19, 1991, and

(2) which would have been timely filed under the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991,

shall be reinstated on motion by the plaintiff not later than 60 days after December 19, 1991. *Plaut, supra,* —— U.S. at ——, 115 S.Ct. at 1451; quoting 15 U.S.C. § 78aa–1 (1988 ed. Supp. V).

In April 1995, the United States Supreme Court declared a portion of § 27A unconstitutional to the extent that subsection b requires federal courts to reopen final judgments entered before the statute's enactment in 1991. *Plaut,* —— U.S. at ——, 115 S.Ct. at

---

1. The new section was part of the Federal Deposit Insurance Corporation Improvement Act of 1991 even though it had nothing to do with the FDIC improvements. This section became § 27A of the Securities Exchange Act of 1934. *Plaut, et al. v. Spendthrift Farm, Inc., et al.,* —— U.S. ——, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995).

1447. Since the plaintiff in the case at bar filed his action after June 19, 1991, the ruling in *Lampf* governs this case.

As discussed above, *Lampf* establishes for Section 10(b) and Rule 10b–5 claims a federal statute of limitations and a statute of repose. *See Plaut*, — U.S. at ——, 115 S.Ct. at 1451. In summary, plaintiff has one year from the time he or she discovers or should have discovered the cause of action and no more than three years from date of the transaction, which gave rise to the cause of action. This opinion will examine in turn below both the statute of repose and the statute of limitations as applied to the instant case.

### A. STATUTE OF REPOSE

■ The legislative history surrounding the 1934 Act indicates that Congress included statutes of repose to prevent lingering liabilities from disrupting normal business and facilitating false claims. *Norris v. Wirtz*, 818 F.2d 1329, 1332 (7th Cir.1987), *cert. denied*, 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987). The statute of repose for Section 10(b) and Rule 10b–5 claims prevents plaintiffs from suing more than three years after the securities violations arise. *Lampf, supra*, 501 U.S. at 364, 111 S.Ct. at 2782. The *Lampf* Court held that tolling principles do not apply to the statute of repose; the Court reasoned that the equitable concept of tolling is incompatible with the establishment of a statute of repose, which serves as an ultimate cutoff filing date. Consequently, equitable tolling principles will not extend the period for filing beyond three years after the transaction.

■ A statute of repose begins to run when the sale of securities is complete and the cause of action accrues. *See Ferguson v. Roberts*, 11 F.3d 696, 703–04 (7th Cir.1993). The accrual of a federal cause of action is a matter of federal law. *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir.1992). Under federal law, a plaintiff's cause of action for a securities fraud case accrues "on the date the sale of the instrument is completed." *McCool v.*

*Strata Oil Co.*, 972 F.2d 1452, 1460 (7th Cir.1992).

■ After reviewing the complaint, we find that the plaintiff filed his complaint within the three years allowed by the statute of repose. In the case at bar, Marks and CDW executed on July 27, 1990 a Stock Purchase Agreement under which CDW redeemed its shares from Marks. Complaint, ¶ 25. Plaintiff's filing of his complaint in June 1993 was timely under the statute of repose.

### B. STATUTE OF LIMITATIONS
#### 1. WHEN THE STATUTE OF LIMITATIONS BEGINS TO RUN

■ The one-year limitations period for a Section 10(b) or Rule 10b–5 action begins to run after the discovery of facts constituting the violation. *Lampf*, 501 U.S. at 363, 111 S.Ct. at 2782. The *Lampf* decision left open the issue of whether the victim of the alleged securities fraud must have actual notice of the fraud for the one-year statute of limitations to begin to run. After *Lampf*, the Seventh Circuit in *Tregenza, supra*, 12 F.3d 717, held that the limitations period in a federal securities case starts running upon either actual or "inquiry notice" by the victim of the alleged fraud. By inquiry notice the Court of Appeals meant the time at which the victim of the alleged securities fraud became aware of facts that would have prompted a reasonable person to investigate whether he or she may have a claim. *Id.* at 718.

The Court of Appeals in *Tregenza* focused its analysis on Section 9(e) of the 1934 Act because *Lampf*[2] applies the statute of limitations for Section 9(e) to Section 10(b) and Rule 10b–5 claims. The Court of Appeals reasoned that nothing in the language, history, or purpose of Section 9(e) forecloses courts from adopting this judicially-created doctrine of inquiry notice to Rule 10b–5 or Section 10 actions. *Id.* at 722.

#### a. ACTUAL KNOWLEDGE

■ The statute of limitations begins to run when the injured party discovers the

---

2. *Lampf*, 501 U.S. at 364, n. 9, 111 S.Ct. at 2782, n. 9.

fraud. *Lampf,* 501 U.S. at 363, 111 S.Ct. at 2782. As the Supreme Court explained, "where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." *Id.* (quoting *Bailey v. Glover,* 88 U.S. 342, 22 L.Ed. 636 (1874)).

Plaintiff alleges that before he executed the Buyout Agreement he asked Krasny about the value and income of CDW and Krasny's advertising company, Northbrook Ad Agency, Inc. ("NAA"). Marks claims that Krasny told him in a telephone conversation in mid-June 1990 that NAA made almost no profit and that any profits NAA made were reinvested in CDW or spent for CDW's benefit. Complaint ¶ 23.

The plaintiff alleges that he first received notice of defendants' fraudulent misrepresentations when CDW filed a Registration Statement with the Securities and Exchange Commission in March 1993. CDW filed a Registration Statement in preparation for CDW's initial public offering of approximately 16 percent of the company's outstanding common stock. Complaint ¶ 27. The plaintiff claims that the Registration Statement contains information about the cash withdrawals exceeding $10 million that defendant Krasny made from CDW and NAA after the execution of the Buyout Agreement. *Id.* at ¶ 28. The plaintiff also alleges that the Registration Statement included information about NAA and CDW's stock as well as transactions between these two enterprises. *Id.* at ¶ 29. Plaintiff maintains in the complaint that the information in the registration statement put him on notice that:

> the representations made by Krasny to Marks prior to the execution of the Buyout Agreement regarding the value and profitability of NAA and use of the profits of NAA were untrue. In particular, the Registration Statement indicates that during years ending on March 31, 1991, March 31, 1992, and March 31, 1993, payments by CDW to NAA exceeded the amounts paid

by NAA to magazines and other media sources by between $300,000 and $700,000 per year. Based on this revelation, Marks has attempted to obtain further information concerning NAA, and has learned that between April 1, 1987 and March 31, 1990, Krasny had secretly accumulated net profits in NAA of approximately $380,000. Further, Marks has learned that Krasny subsequently withdrew these profits in cash from NAA. Complaint at ¶ 29.

The defendants respond by arguing that the Registration Statement could not have put the plaintiff on notice of his alleged claim. The complaint states that the financial information in the Registration Statement concerning NAA and Krasny's compensation was. for the years ending March 31, 1991 through March 1993. Complaint ¶ 29. The defendants maintain that the Registration Statement could not have informed the plaintiff of his alleged claim because the statement provided financial information for the period after March 31, 1990. According to the defendants, the plaintiff sold his shares at a price based on CDW's book value as .of March 31, 1990. Defendant's Reply Brief, at 8 nt. 3, referring to the Buyout Agreement at ¶ 3(ii).

■ This court finds that the plaintiff has not pled himself out of court based upon his actual knowledge of the defendants' alleged wrongdoing. Marks claims that the Registration Statement that CDW filed with the SEC in March 1993 put him on notice of the defendants' alleged securities violations. Based upon that time frame, Marks' June 1993 filing of this action was within the statute of limitations. The question remains, however, whether Marks had actual notice before March 1993. The complaint fails to state exactly when Marks learned that Krasny had secretly accumulated net profits in NAA for the period of April 1, 1987 through March 31, 1990. The facts pled thus far do not clearly indicate that the plaintiff is barred from bringing this suit based upon his actual knowledge of an alleged securities violation. The complaint survives the motion to dismiss on this issue. We next consider whether the facts pled constitute "inquiry notice."

### b. "INQUIRY NOTICE"

The defendants claim that the plaintiff was on "inquiry notice" as of the time the plaintiff exercised the Buyout Agreement in July 1990. The plaintiff was a shareholder and senior employee of the firm. The defendants maintain that as significant shareholder, the plaintiff had the right to inspect CDW's books and records. Motion to Dismiss Brief at 7. The defendants assert that the plaintiff's access to financial information about CDW put the plaintiff on inquiry notice of his claim as of 1990. According to the defendants, the plaintiff's failure to exercise reasonable diligence to discover the alleged misrepresentations within a timely period bars this action.

Federal securities regulations allocate burdens of disclosure and investigation between the parties. "The securities laws are designed to induce the person who possesses information to reveal it accurately. The obligation rests with the speaker, not with the listener." *Astor Chauffeured Limousine v. Runnfeldt Inv.*, 910 F.2d 1540, 1546 (7th Cir.1990). The Seventh Circuit explained that "securities fraud is an intentional tort, and that contributory negligence (= failure to investigate independently) is not a defense when the tort is intentional." *Id.* This Circuit went on to explain: "precautions are wasteful, and rules of law ought not induce buyers of securities to verify information that the sellers are supposed to provide. Securities laws are designed, in large part, to compel the person who knows specific internal or corporate information to reveal it, and thereby eliminate wasteful duplication of effort in digging out facts. To say that a deceived buyer may not recover unless it has tried to verify the seller's statements would prevent the achievement of this objective." *Id.* Federal law does not impose upon purchasers of securities an affirmative duty to verify the seller's information.

▆▆▆ This Circuit recognizes, however, the concept of "inquiry notice" as applied to federal securities cases. *See DeBruyne v. Equitable Life Assurance Society of the United States*, 920 F.2d 457, 466 (7th Cir. 1990) (Plaintiff was on inquiry notice because the defendant's disclosures were contradicted by stream of documents); *see, also, Astor Chauffeured Limousine Co., supra*, 910 F.2d at 1544. The Seventh Circuit has explicitly applied "inquiry notice" to Rule 10b–5 plaintiffs. *See Tregenza, supra*, 12 F.3d at 722. The law imposes an obligation on the plaintiff to investigate facts that actually put or should put him or her on notice of an alleged material misrepresentation. *DeBruyne*, 920 F.2d at 466. "Inquiry notice" does not allow a plaintiff leisurely to discover the full details of the alleged misrepresentation. *Id.* Inquiry notice will trigger the running of the statute of limitations in securities fraud cases. *Id.*

▆▆▆ There are at least two situations in which federal securities laws impose an affirmative duty on a plaintiff to investigate. First, if the plaintiff knew enough to call for an inquiry. *Astor Chauffeured Limousine, supra*, 910 F.2d at 1544. Second, if the plaintiff had materials in his possession, even if he chose not to read them, that would have put a reasonable person on inquiry notice of securities fraud. *DeBruyne, supra*, 920 F.2d at 466 nt. 18. Under these circumstances a plaintiff could not avoid the running of the statute of limitations.

The plaintiff in the case at bar was on inquiry notice prior to the redemption of his shares of stock by CDW. Marks was obligated, according to the Complaint, to give CDW and Krasny right of first refusal to buyback Marks' shares upon termination of Marks' employment with CDW. Complaint at ¶ 15. Krasny informed Marks during a meeting in March 1990 that Marks' tenure at CDW would end shortly. *Id.* at ¶ 19. On May 14, 1990, Krasny mailed Marks a letter immediately terminating Marks' employment with CDW. *Id.* at ¶ 21. The combination of the March meeting and the May letter triggered the contractual right of CDW and Krasny to first refusal of Marks' shares.

Marks claims that in preparation for CDW's buyout of his shares, Marks inquired of Krasny as to the value of CDW and Krasny's advertising agency, NAA. Complaint at ¶ 23. Krasny, the sole shareholder of NAA, established NAA to obtain "the commissions available to advertising agencies, including

agencies owned by advertisers, on magazine and other advertising placements." *Id.* at ¶ 13. CDW channeled most of its advertising work to NAA. *Id.* Marks states that during his tenure, he "did not negotiate advertising rates, and he received no information regarding the financial performance of NAA or the substance or structure of transactions between CDW and NAA except gross amounts paid by CDW to NAA." *Id.*

Marks claims that Krasny misrepresented the value of CDW by understating the profitability of NAA. Marks alleges that during a telephone conversation with Krasny in mid-June 1990, Krasny told Marks that "NAA made almost no profit and that any such profits had been reinvested in CDW or spent by NAA for CDW's benefit." *Id.* at ¶ 23. Marks maintains that based on information appearing in a Registration Statement that CDW filed with the Securities Exchange Commission in 1993, Marks learned that Krasny's earlier representation about NAA's profitability was false. *Id.* at ¶ 29. Marks asserts that he reasonably relied upon Krasny and CDW's misrepresentation when entering into the sale of his shares to CDW. *Id.* at 35.

The Complaint also indicates that by June 1990, there was "bad blood" between Marks and Krasny. Allegedly, during the March 1990 meeting between Krasny and Marks, Krasny told Marks that Marks would not benefit from the sale of his minority interest unless he sold on terms dictated by Krasny. Complaint at ¶ 19. At a board of directors meeting held on June 12, 1990, Krasny proposed that CDW increase his compensation for the year ending March 31, 1990. *Id.* at 22. Reportedly, the proposal would have enlarged tremendously Krasny's compensation package from approximately $250,000 to $1.55 million. *Id.* Marks, as a director of CDW, voted against this resolution. *Id.* Marks alleges that Krasny coerced him into ultimately agreeing to the increased compensation package in exchange for CDW's offer price for Marks' shares. *Id.* at ¶ 24. Around the same time that Marks sold his stock back to CDW, he also signed a docu-

ment approving Krasny's increased compensation package. *Id.* at ¶¶ 24, 25.

At the time of the buyout in dispute here, the plaintiff was a minority shareholder in a closely-held or close corporation. As this Circuit has explained, a minority shareholder in a close corporation is in an unenviable position:

> a majority coalition may gang up on him. And he may not have the usual recourse of a victimized minority shareholder—to sell out. For there may be no market for his shares, except the very people who have ganged up on him. *Frandsen v. Jensen–Sundquist Agency, Inc.,* 802 F.2d 941, 945 (7th Cir.1986); see, also, Easterbrook & Fischel, *Close Corporations and Agency Costs,* 38 Stan.L.Rev. 271 (1986).

The absence of a clearly-defined market for minority shares in a close corporation and the lack of an available index of the shares' value compel minority shareholders who wish to sell their stock to value their shares based upon the records of the corporation rather than a market rate for shares. *See, Ostrow, et al. v. Bonney Forge Corp.,* 1994 WL 114807, *11 (Del.Ch.). Consequently, the opportunity to inspect corporate records for valuation purposes gains heightened significance when dealing with the sale of minority shares in a close corporation.

▆▆▆ During the period through the redemption at end-July 1990 and beyond, CDW and its predecessor operated under the laws of Illinois[3]. Complaint at ¶ 2. According to Illinois corporate law, a shareholder of record has a right to examine the books and records of a corporation. 805 ILCS 5/7.75 (West 1992). Illinois provides that any corporation or officer who wrongfully refuses to allow a shareholder to examine its records "shall be liable to such shareholder, in a penalty of up to ten percent of the value of the shares owned by such shareholder, in addition to any other damages or remedy afforded him or her by law." 805 ILCS 5/7.75(d) (West 1992). Illinois courts have held that a shareholder who is wrongfully refused access to corporate records has a cause of action against the corporation and such action is unaffected by a subsequent

---

**3.** CDW reincorporated in 1993 under the laws of Delaware.

sale or transfer of the stock before suit is brought. *West Shore Associates, Ltd., v. American Wilbert Vault Corp.,* 269 Ill. App.3d 175, 206 Ill.Dec. 489, 492, 645 N.E.2d 494, 497 (First District 1994).

■ We find that for several reasons Marks was on inquiry notice on the day he sold his shares to CDW, if not before. As a minority shareholder in a close corporation, Marks had a right to see the records of CDW and its predecessor. It is arguable whether he had a right to review the books of NAA, a separate corporate entity. *See South Side Bank v. T.S.B. Corp.,* 94 Ill.App.3d 1006, 1008–09, 50 Ill.Dec. 369, 419 N.E.2d 477 (First District 1981). If NAA had transferred its profits to CDW, as Krasny allegedly stated, then such an agreement would have been a corporate asset that would have appeared somewhere in CDW's corporate records. Marks had a legally cognizable right to CDW's materials, which would have told him whether or not such an agreement between NAA and CDW actually existed. Krasny's attempts in 1990 to extract an enormous increase in his compensation package combined with the acrimonious and coercive relations between Marks and Krasny by the second quarter of 1990 placed Marks on inquiry notice about the profitability of NAA and its effect on CDW by mid–1990.

■ In analyzing the issue of inquiry notice, the Seventh Circuit explained that whether a plaintiff should have known about allegedly fraudulent conduct is an objective test. *Norris v. Wirtz,* 818 F.2d 1329, 1334 (7th Cir.1987). The Court of Appeals stated that "whether the investor actually exercised diligence … is irrelevant. The question is not whether she did, but whether diligence would have paid off. Failure to be diligent is no excuse." *Id.* The statute of limitations begins to run when a reasonable person would have appreciated the need for further inquiry. *Norris, supra,* 818 F.2d at 1334.

The facts pled thus far indicate that diligence would have informed a reasonable person in Marks' position about the value of Marks' shares prior to the sale. We find this especially true considering that there was no readily available market to assess the value of the minority interest. An objectively rea-

sonable person would have appreciated the need for further inquiry in 1990. The financial records of CDW, to which Marks had a legal right, combined with the hostile relations between the plaintiff and Krasny, Krasny's attempts to boost enormously his income, and the arms-length nature of the buyout involving a close corporation were enough to put a reasonable person on notice of the need for further inquiry. All these factors together with the asserted coercive nature of Krasny's dealings with Marks in 1990 constituted "storm warnings" and inquiry notice.

The Buyout Agreement indicates that the plaintiff had a lawyer and an accountant review the buyout prior to the transaction. We are reminded of the United State's Supreme Court's long-held principle that an expert's inattention or bad advice does not toll the time to sue. *United States v. Kubrick,* 444 U.S. 111, 124, 100 S.Ct. 352, 360, 62 L.Ed.2d 259 (1979).

We recognize that sometimes courts have deferred on the issue of inquiry notice until later in litigation or at trial. *See Vassilatos, supra,* 1993 WL 177780, 1993 U.S.Dist. LEXIS 6620 (S.D.N.Y. May 19, 1993); *LaSalle, et al. v. Medco Research Inc.,* 54 F.3d 443 (7th Cir.1995) (Class members alleged fraudulent concealment of facts by a pharmaceutical company as it applied for approval of a product by the Food and Drug Administration). In *Vassilatos,* a securities fraud case, the district court held that ruling on inquiry notice on the then pending motion to dismiss was premature. In that case, the court determined that it would be in a better position to examine the issue of inquiry notice once discovery was complete. 1993 WL 177780 at 1–2, 1993 U.S.Dist. LEXIS 6620 at *4. The court stated that the complaint failed to provide sufficient information concerning the plaintiffs' knowledge and circumstances surrounding some of the key events. *Id.* In *LaSalle,* the Seventh Circuit found that the district court had dismissed a Rule 10b–5 action prematurely on a motion to dismiss because of "a record as barren as this." 54 F.3d at 447.

*Vassilatos* and *LaSalle* are distinguishable from the instant case. The record here is not barren of facts regarding the issue of inquiry notice. Here the complaint provides a clear description of the allegedly acrimonious and coercive relationship between Krasny and Marks as of early 1990. It is appropriate to decide the issue of inquiry notice at this time considering the hostile relations between Krasny and Marks as of mid–1990 combined with the other "storm warnings" we described earlier. Unlike *Vassilatos* and *LaSalle,* the plaintiff here provided enough background information to defeat his federal claim.

Marks was on inquiry notice by 1990. Even if we assume that Marks was on inquiry notice at the earliest on July 27, 1990, the day CDW redeemed Marks' shares and one month after the telephone conversation between Marks and Krasny, then Marks had one year from July 27, 1990 to file his federal cause of action. Since the plaintiff waited until 1993 to file his Complaint before this court, we find that his federal action is time-barred by the statute of limitations.

## C. EQUITABLE TOLLING AND ESTOPPEL

Federal law supplies the relevant tolling principles. Equitable tolling means that without fault of either party, the plaintiff lacked sufficient information to sue within the period established by the statute of limitations. *Tregenza, supra,* 12 F.3d 717 (7th Cir.1993) (The Court of Appeals held "inquiry notice" applicable in Rule 10b–5 suits).

Before the U.S. Supreme Court decision in *Lampf,* this Circuit held that federal law provides for two types of equitable tolling for fraudulent behavior in securities actions. *Davenport, supra,* 903 F.2d at 1142. In the first instance, courts toll the statute "where the fraud goes undiscovered even though the defendant does nothing to conceal it." *Id.* quoting *Suslick v. Rothschild Securities Corp.,* 741 F.2d 1000 (7th Cir.1984). A plaintiff's due diligence in attempting to uncover the fraud is critical. *Id.* "It is well established that a plaintiff may not merely rely on his own unawareness of the facts or law to toll the statute." *Hupp v. Gray,* 500 F.2d

993, 996 (7th Cir.1974). In the second instance, courts toll the statute of limitations when the fraud remains undisclosed because the defendant took affirmative steps to conceal the fraud. *Davenport,* 903 F.2d at 1142. In this second case, the plaintiff has no duty to discover the fraud. *Id.* "Where active concealment exists, the statute is tolled until there is actual discovery of the fraud." *Id.*

In *Hupp, supra,* the Seventh Circuit dealt with the first of two types of cases involving equitable tolling. The Court of Appeals affirmed the district court's dismissal of plaintiff's federal securities fraud claim that was time-barred under the statute of limitations. Although the Court of Appeals did not use the term "inquiry notice" they discussed the concept. The Seventh Circuit held that the plaintiff could not invoke the equitable tolling doctrine because he was aware of facts that would have put a reasonable person on notice of the need for inquiry. *Id.*

After *Hupp,* the Seventh Circuit in *Norris v. Wirtz, supra,* considered whether to allow tolling of the statute of limitations when the plaintiff was on "inquiry notice" of securities fraud. 818 F.2d at 1333–34. There the plaintiff, a trust beneficiary, wanted the federal court to toll the statute of limitations until the trustee confessed his misconduct or repudiated his office. 818 F.2d at 1333–34. The Court of Appeals stated its concern about allowing this because to do so "would excuse investors from all duty of inquiry, even after they have been put on actual notice that something is amiss. In many cases it would give investors a perpetual put or call, allowing them to speculate on the market without risk to themselves." *Id.* at 1333.

The Court of Appeals ultimately rejected the plaintiff's argument in *Norris,* and held that when a defendant lies and the plaintiff does not reasonably investigate, then the statute of limitations begins to run immediately. *Id.* at 1334. The Court acknowledged earlier Seventh Circuit cases allowing tolling where the fraud went undiscovered even though the defendant did nothing to conceal it. *Id.* at 1334. The Court of Appeals then went on to distinguish *Norris* from those cases: "[n]one of our cases, however, and

none of the state cases on which [the plaintiff] ... relies, dealt with a deceit so easy to uncover from documents in hand." *Id.*

We find that the Complaint in the instant case does not provide a basis for tolling the statute of limitations under either federal equitable tolling exception. As in *Hupp* and *Norris*, the alleged deceit in the case at bar would have been easy to detect, in part, from documents to which the plaintiff was entitled under the law to review; a comprehensive inquiry in the case at bar before July 1990, would have turned up facts necessary to file a complaint. That fact coupled with the high level of animosity and strain between the parties in 1990 convinces us that a reasonable person would have investigated further. The plaintiff cannot blame the defendants for plaintiff's apparent lack of thoroughness in investigating the value of his shares prior to the redemption.

Since the plaintiff fails to allege due diligence before July 1990, the remaining tolling exception pre-*Lampf* requires him to plead active concealment of the fraud. Federal law requires a plaintiff to plead that the defendant took "*additional* affirmative steps after committing the fraud to keep it concealed" (emphasis added) for the second tolling exception to apply. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 815 F.2d 452 at 456 n. 4 (7th Cir.1987). The Complaint is equally wanting here. It fails to plead any additional acts on the part of the defendants to cover up the alleged fraud other than that of the defendants' persistent failure to disclose material information. Such an allegation is insufficient to invoke this tolling exception. Since the plaintiff lacks allegations to support either "due diligence" or "active concealment", we will not allow federal equitable tolling based upon the pre-*Lampf* doctrine.

The United States Supreme Court in *Lampf, supra,* rejected the concept of equitable tolling in securities fraud cases. 501 U.S. at 363, 111 S.Ct. at 2782. The Court determined that the doctrine of equitable tolling is fundamentally inconsistent with the federal statute of limitations and statute of repose in securities cases. *Id.* "The 1–year [statute of limitations] period, by its terms, begins after discovery of the facts constituting the violation, making tolling unnecessary. The 3–year limit is a period of repose inconsistent with tolling." *Id.* When knowledge or notice is required to trigger the running of the statute of limitations, there is no room for equitable tolling. *See, id.*

While upholding the *Lampf* doctrine concerning equitable tolling, this Circuit has also carved out an important exception. The Court of Appeals explained equitable tolling is inconsistent with a statute of limitations that does not start to run until the plaintiff has enough information to sue. *Tregenza, supra,* 12 F.3d at 721. The Court of Appeals, however, determined that equitable estoppel may apply even when equitable tolling would not. *Id.* We recognize that sometimes courts broadly use the term "equitable estoppel" to cover various concepts, including promissory estoppel, judicial estoppel, and fraudulent concealment. *See, e.g., Brook Weiner, et al. v. Coreq, Inc.,* 1994 WL 444798 (N.D.Ill.1994) (Duff, J.); *Singletary v. Continental Il. Nat. Bank,* 9 F.3d 1236, 1241 (7th Cir.1993). The Court of Appeals explained that equitable estoppel arises when a defendant's affirmative acts thwart a plaintiff from suing in a timely manner; an example is when a defendant promises not to plead the statute of limitations pending settlement discussions. *Tregenza, supra,* 12 F.3d at 721; *Singletary,* 9 F.3d at 1241. The Complaint provides no support for an assertion of equitable estoppel. Consequently, neither equitable tolling nor equitable estoppel will save the plaintiff's time-barred federal securities claim here.

Since we find that the statute of limitations precludes the plaintiff from raising his federal securities claim, based on the facts pleaded thus far, we need not reach the other arguments the defendants raise in their briefs.

*CONCLUSION*

For the reasons explained above, we dismiss the federal securities claim without prejudice because it is time-barred by the federal statute of limitations. We also dismiss the pendent state claims because we no longer have federal jurisdiction. *See United*

*Mine Workers v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). We grant plaintiff leave to file an amended complaint if he can plead facts that indicate that this suit is not barred by the statute of limitations. We caution the plaintiff about filing an amended complaint containing the same defect.